[Cite as *State v. Hicks*, 2014-Ohio-5630.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SENECA COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                    CASE NO. 13-14-19

    v.

LLOYD V. HICKS,                           O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Seneca County Common Pleas Court
Trial Court No. 13 CR 0166

Judgment Affirmed

Date of Decision: December 22, 2014

APPEARANCES:

    *Kent D. Nord* for Appellant

    *Brian O. Boos* for Appellee

**SHAW, J.**

{¶1} Defendant-appellant Lloyd V. Hicks ("Hicks") appeals the June 12, 2014 judgment of the Seneca County Common Pleas Court sentencing Hicks to serve an aggregate prison term of 17 years after Hicks was found guilty in a jury trial of two counts of Felonious Assault in violation of R.C. 2903.11(A)(2), (D)(1)(a), both felonies of the first degree and both containing specifications that Hicks discharged a firearm at a peace officer while committing the offense, one count of Abduction in violation of R.C. 2905.02(A)(2),(C), a felony of the third degree, and one count of Aggravated Arson in violation of R.C. 2909.02(A)(1),(B)(2), a felony of the first degree.

{¶2} The facts relevant to this appeal are as follows. On October 9, 2013, Hicks was indicted for two counts of Felonious Assault in violation of R.C. 2903.11(A)(2), (D)(1)(a), both felonies of the first degree and both containing specifications that Hicks discharged a firearm at a peace officer while committing the offenses, one count of Abduction in violation of R.C. 2905.02(A)(2),(C), a felony of the third degree, and one count of Aggravated Arson in violation of R.C. 2909.02(A)(1),(B)(2), a felony of the first degree. The charges stemmed from incidents all occurring on September 5, 2013.

{¶3} On November 8, 2013, Hicks was arraigned and entered pleas of Not Guilty and Not Guilty by Reason of Insanity to the charges against him. (Doc.

13). As a result, the trial court ordered a competency evaluation of Hicks, which was done, and then the trial court held a hearing as to Hicks's competency. Hicks was ultimately determined to be competent to stand trial. (Doc. 21).

{¶4} Hicks then requested a second competency evaluation, which was granted by the trial court, and Hicks was again found to be competent following a hearing. (Doc. 29). After both competency evaluations, Hicks withdrew his plea of Not Guilty by Reason of Insanity and pled Not Guilty to the charges against him.

{¶5} The case then proceeded to a jury trial, which was held June 9-10, 2014. At trial the State first called Donna Hicks, Hicks's wife of 23 years. Donna testified that in the weeks and months prior to September 5, 2013, she and Hicks had been having marital issues. (Tr. at 148). Donna testified that a tornado had damaged their residence and that their basement had been flooded so they were having the house repaired, which was a frequent source of argument between them. (*Id.*) Donna testified that Hicks accused Donna of being in a relationship with the contractor, and accused her of being "in cahoots" with him when the repairs were delayed. (*Id.*) Donna testified that Hicks was irritated with the delay in the home repairs and that he had become verbally abusive toward her. (Tr. at 148).

{¶6} Donna testified that on the morning of September 5, 2013, she was leaving for work and noticed that Hicks had placed two gas cans in her car. (Tr. at 149). Donna testified that she and Hicks owned two acres of land and used a lot of gas for their tractor so Hicks would regularly put the empty gas cans in her car and she would fill them and bring them back for him. (Tr. at 149). Donna testified that she filled up the two gas cans Hicks had placed in her car and returned them on her lunch break from work. (Tr. at 150). Donna testified that she placed the two gas cans in the shed that day and saw that there were four total. (Tr. at 150-151). She testified that she then went into the kitchen to eat her lunch. (Tr. at 151).

{¶7} Donna testified that as she ate her lunch, Hicks came in from outside and started a conversation about the roof and how the contractor was "ripping [them] off." (Tr. at 152). Donna testified that Hicks became upset, threw his hat, and knocked her pop onto her sandwich. (Tr. at 152). Donna testified she then decided to go back to work. (*Id*.) Donna testified that Hicks told her she had an hour for lunch and she was not going anywhere because they needed to talk about the repair issues. (*Id*.) Donna testified that she then went outside to smoke and Hicks followed. (Tr. at 153). Donna testified that she tried to leave, which resulted in her and Hicks engaging in a "slap and punch fest," where her glasses were ultimately knocked off and she walked away. (*Id*.)

{¶8} Donna testified that Hicks made the comment that "nobody is here to help you" and that she was afraid of him at the time. (Tr. at 153). Donna also testified that Hicks took her phone and threw it in the front yard and told her she only uses the phone to "call [her] boyfriends" and that she was not going to use the phone to call for help. (Tr. at 154). Donna testified that Hicks then went into the garage and got a sledgehammer and smacked it into the ground. (Tr. at 155). She testified that she thought Hicks was smashing her phone. (Tr. at 155). Donna testified that Hicks then made a comment that they could pull the cars into the garage, and he could shoot her, set the house on fire, and then kill himself. (Tr. at 155-156). Donna testified that Hicks said he did not believe in God and that "[t]oday was the day and this was the end of it." (Tr. at 155).

{¶9} Donna testified that she then again tried to leave, but Hicks grabbed her and tried to pull her toward the house. (Tr. at 156). Donna testified that Hicks had a hold of both her arms and smacked her. (*Id.*) She testified that she kicked him and Hicks said that she kicked "like a little bitch," so he then kicked her back and pulled her four feet toward the garage. (*Id.*) Donna testified that she then kicked Hicks twice in the groin and got away from him to her car. (*Id.*) Donna testified that another brief struggle ensued at her car, but she soon got away and drove back to work. (Tr. at 157).

{¶10} Donna testified that when she got back to work she told her coworkers what had happened and that she was afraid of Hicks, so her co-worker contacted security and the police were then called. (Tr. at 157-158). Donna testified that she was then taken to the police station, where she heard over the radio about a fire occurring at her home. (Tr. at 159).

{¶11} Donna testified that as a result of the altercation with Hicks the side of her face was black and blue, there was a twitch in her eye, and her vision was blurry. (Tr. at 160).

{¶12} The State next called Sharon Fuchs, who was a neighbor of Hicks and Donna. Fuchs testified that on September 5, 2013, she went to lunch with her daughter around 12:30 or 1:00 p.m. and saw billowing smoke coming out of the Hicks' home. (Tr. at 180). Fuchs testified that Donna's car was gone and that Hicks was under the pavilion pacing. (Tr. at 180). Fuchs testified that she said to Hicks the house was on fire and Hicks said "I know get the F away." (Tr. at 181).

{¶13} The State next called Detective E. Burt of the Bellevue Police Department. Detective Burt testified that he was dispatched to the Hicks residence, which was engulfed in flames. (Tr. at 188). Detective Burt testified that upon arrival he was informed by the firemen who were already on the scene that they could not do their job because of a man in the backyard with a firearm.

(Tr. at 188). Detective Burt testified that he then observed Hicks in a chair with a handgun in his lap in the backyard. (Tr. at 189).

{¶14} Detective Burt testified that Officer Trego arrived on the scene minutes later, and that together they attempted to approach Hicks. (Tr. at 190). Detective Burt testified that while they approached Hicks, he heard someone yell "get away" and then he heard a shot fired, which went to his left. (Tr. at 194). Detective Burt testified that he heard the bullet go through the grass roughly ten to fifteen feet from him. (Tr. at 194). Detective Burt testified that Officer Trego yelled "he shot at us" and that they then retreated to call for backup due to Hicks shooting, and the presence of a propane tank nearby that was potentially in danger of exploding from the fire. (Tr. at 194-195).

{¶15} The State next called Officer Todd Trego of the Bellevue Police Department. Officer Trego testified that he was originally dispatched to the Home Savings Bank where Donna worked to speak with her and take her to the Bellevue Police Department. (Tr. at 211). Officer Trego testified that he was subsequently dispatched to the Hicks' home, where he was advised by Detective Burt that a man with a gun was in the backyard. (Tr. at 212).

{¶16} Officer Trego testified that he and Detective Burt attempted to make contact with Hicks, so they walked between the house that was on fire and the next door neighbor's house toward a shed using it as cover. (Tr. at 212). Officer Trego

testified that Detective Burt was on his right and that he noticed a propane tank approximately 10-15 feet from the house and was worried about an explosion. (Tr. at 212). Officer Trego testified that upon noticing the propane tank, he and Detective Burt discussed whether to get closer. (Tr. at 213). Officer Trego testified that as they were discussing whether to get closer, Hicks shouted to "get back" or "get away." (Tr. at 213). Officer Trego testified that he then saw Hicks fire a gun right in their direction, saw the muzzle flash, and heard a possible round strike the grass nearby. (Tr. at 213). Officer Trego testified that he and Detective Burt then decided to retreat. (*Id.*)

{¶17} The State next called Deputy Mark Lawson of the Seneca County Sheriff's Office. Deputy Lawson testified that he was dispatched to the Hicks' residence for the house fire and that upon his arrival fire trucks were present but could not begin to help because of Hicks having a gun. Deputy Lawson testified that he exited his cruiser in a different area of the property than where Detective Burt and Officer Trego had approached Hicks. Deputy Lawson testified that as he exited his cruiser, Hicks pointed his gun at him and fired it, so Deputy Lawson got back in his cruiser and backed up to a safer location and called in the shot. (Tr. at 229-230). Deputy Lawson testified that it was "absolutely not" a warning shot. (Tr. at 239). Deputy Lawson testified that he heard a second shot as he exited the cruiser but he did not see it, and that the shots were ten to fifteen seconds apart.

(Tr. at 237). Deputy Lawson testified that he then got his M-16 out of his vehicle but he did not fire it because Hicks did not point his gun at him again. (Tr. at 230).

{¶18} Deputy Lawson testified that after an hour of negotiation, Hicks put his weapon down and was taken to jail. Deputy Lawson testified that he was the officer who took Hicks to jail, and that he noticed Hicks had burnt hair on his forearm, abrasions on his right hand ring finger, and burnt hair on the back of his head. (Tr. at 232).

{¶19} On cross-examination Deputy Lawson testified that while he was on the Hicks' property he heard loud noises coming from inside the house fire that he thought were rounds of ammunition popping off.[1] (Tr. at 235). However, Deputy Lawson testified that it was not possible that the shots that were fired at him were simply rounds popping off in the basement of the home. (Tr. at 236).

{¶20} The State next called Sheriff W. Eckelberry, the Seneca County Sheriff. Sheriff Eckelberry testified that he was dispatched for the house fire and a subject with a weapon. (Tr. at 244). He testified that when he arrived, Hicks was in the backyard, east of the residence sitting in a lawn chair. (Tr. at 245). Sheriff Eckelberry testified that he shut down the road near the property, and then talked to Hicks over the PA system. (Tr. at 247). Sheriff Eckelberry testified that he

---

[1] Testimony established that Hicks had various guns and ammunition in the basement of the home.

corresponded with Hicks and eventually got Hicks to put his gun down and walk back to a police car with him.  (Tr. at 247).

{¶21} The State next called Deputy Craig Robbins from the Seneca County Sheriff's Office.  Deputy Robbins testified that he located a spent casing near where Hicks had been in the yard.  (Tr. at 254).  Deputy Robbins testified that the casing matched the rounds in the gun Hicks had been using.  (Tr. at 273).

{¶22} The State next called Kevin Reinbolt, a Detective with the Seneca County Sheriff's Office.  Detective Reinbolt testified that he recovered a second shell casing from the scene that matched Hicks's firearm.  (Tr. at 289).  Detective Reinbolt also testified that heat from the fire could be felt 20-30 feet away, and that the combustion of the fire blew the front door out.  (Tr. at 295).

{¶23} In addition, Detective Reinbolt testified that he interviewed Hicks at the Sheriff's office.  The video of that interview was played for the jury, which included Hicks stating that Donna was the main aggressor in their altercation, and that Hicks had Parkinson's disease.  (State's Ex. 12).  Hicks stated in the interview that shots had probably been fired in the area where shell casings were found because he had been shooting at coyotes.  (*Id.*)  The video showed Hicks saying that he remembered watching the house burn on the date of the incidents thinking "What'd I do?"  (*Id.*)  During the interview Hicks also said that Donna would not know anything about the fire because she left.  (*Id.*)

{¶24} The last witness called by the State was Donald Illig an Arson Investigator with the Fire Marshall's Office. Donald Illig testified that he determined that the fire to the home had been intentionally set. (Tr. at 334). He also testified that the fire was a risk to the people looking to help, to the firefighters and the police officers on scene due to the amount of smoke, the ammunition in the basement that was popping off, and the propane tank outside the home, which posed a "significant threat" to cause an explosion that could send shrapnel hundreds of feet. (Tr. at 335-337).

{¶25} At the conclusion of Illig's testimony the State rested its case and Hicks made a Crim.R. 29 motion for acquittal, which was denied by the trial court. Hicks then specifically stated that he did not want an instruction on lesser included offenses. Subsequently the parties proceeded to closing arguments and the court gave final instructions to the jury. The case was then submitted to the jury for deliberation.

{¶26} Ultimately the jury found Hicks guilty of both counts of Felonious Assault in violation of R.C. 2903.11(A)(2), (D)(1)(a), both felonies of the first degree, and the jury found Hicks guilty of the specifications on each of the two counts that Hicks discharged a firearm at a peace officer while committing the offenses. Hicks was also found guilty of Abduction in violation of R.C. 2905.02(A)(2),(C), a felony of the third degree, and he was found guilty of

Aggravated Arson in violation of R.C. 2909.02(A)(1),(B)(2), a felony of the first degree. The trial court set sentencing for the following day.

**{¶27}** On June 12, 2014, Hicks's sentencing hearing was held. At the sentencing hearing, the State recommended that Hicks serve an aggregate 20 year prison sentence. Hicks's attorney made a statement in mitigation, and then Hicks spoke on his own behalf. After hearing the statements of the parties, the court sentenced Hicks to serve 10 years in prison on Count 1 Felonious Assault, and 7 years for the firearm specification, to be served consecutively. Hicks was ordered to serve 10 years on Count 2, Felonious Assault, and 7 years on the firearm specification. Hicks was ordered to serve 12 months on Count 3, Abduction, and 10 years on Count 4 Aggravated Arson. All counts were ordered to be served concurrent to each other, with the sole exception of the Felonious Assault in Count 1 and the firearm specification in Count 1, for an aggregate prison term of 17 years. A judgment entry reflecting this sentence was filed that same day, June 12, 2014. (Doc. 58).

**{¶28}** It is from this judgment that Hicks appeals, asserting the following assignment of error for our review.

**ASSIGNMENT OF ERROR 1**
**THE CONVICTION IN THE TRIAL COURT SHOULD BE REVERSED BECAUSE THE EVIDENCE AND THE DECISION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND BECAUSE THE EVIDENCE SUPPORTING IT WAS INSUFFICIENT AS A MATTER OF**

**LAW TO PROVE THE CONVICTIONS BEYOND A REASONABLE DOUBT.**

**{¶29}** In his assignment of error, Hicks contends that there was insufficient evidence to convict him of two counts of Felonious Assault and the accompanying specifications that he discharged a firearm at a peace officer in committing the offenses, that there was insufficient evidence to convict him of one count of Abduction and that there was insufficient evidence to convict him of one count of Aggravated Arson. In addition, Hicks argues that his convictions were against the manifest weight of the evidence.

*Standard of Review*

**{¶30}** Whether there is legally sufficient evidence to sustain a verdict is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Sufficiency is a test of adequacy. *Id.* When an appellate court reviews a record upon a sufficiency challenge, " 'the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Leonard,* 104 Ohio St.3d 54, 2004–Ohio–6235, ¶ 77, quoting *State v. Jenks,* 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

**{¶31}** The Ohio Supreme Court has "carefully distinguished the terms 'sufficiency' and 'weight' in criminal cases, declaring that 'manifest weight' and

'legal sufficiency' are 'both quantitatively and qualitatively different.' " *Eastley v. Volkman,* 132 Ohio St.3d 328, 2012–Ohio–2179, ¶ 10, quoting *State v. Thompkins,* 78 Ohio St.3d 380 (1997), paragraph two of the syllabus.

**{¶32}** Unlike our review of the sufficiency of the evidence, an appellate court's function when reviewing the weight of the evidence is to determine whether the greater amount of credible evidence supports the verdict. *Volkman, supra,* at ¶ 12; *Thompkins*, *supra*, at 387. In reviewing whether the trial court's judgment was against the weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *Thompkins* at 387. In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder " 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Andrews,* 3d Dist. No. 1–05–70, 2006–Ohio–3764, ¶ 30, quoting *State v. Martin,* 20 Ohio App.3d 172, 175 (1st Dist.1983). Because reversals based upon the manifest weight are for exceptional circumstances, as the Ohio Supreme Court held in *Thompkins,* Section 3(B)(3), Article IV of the Ohio Constitution mandates the unanimous concurrence of all three judges on the reviewing panel to reverse a defendant's conviction. *Thompkins* at 389.

*1. Felonious Assaults*

{¶33} In this case Hicks was convicted of two counts of Felonious Assault in violation of R.C. 2903.11(A)(2),(D)(1)(a), which reads "No person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance. * * * If the victim * * * is a peace officer * * * felonious assault is a felony of the first degree." Both felonious assault counts contained specifications under R.C. 2941.1412, which requires the State to establish that "the offender discharged a firearm at a peace officer * * * while committing the offense."

{¶34} On appeal, Hicks argues that there was insufficient evidence to support his Felonious Assault convictions and the accompanying specifications, and that the convictions were against the weight of the evidence. Specifically, Hicks contends that none of the officers witnessed Hicks shooting at the other officers, that none of the officers saw a "muzzle flash" from the gun, that none of the officers saw any recoil on the gun when it was fired, and that no cartridge was found in the chamber when the firearm was "made safe" by Deputy Robbins. Despite Hicks's contention, ample testimony was presented by the officers at trial from which the trier-of-fact could determine that Hicks had fired his gun at the police officers in both separate incidents.

{¶35} The first Felonious Assault conviction was related to the bullet that Hicks fired at Detective Burt and Officer Trego. Regarding that incident, Detective Burt testified that when Officer Trego arrived on scene, he and Officer Trego attempted to approach Hicks in the backyard of his home. Detective Burt testified that while approaching Hicks, he heard Hicks yell "get away" and then he heard a shot fired, which Detective Burt testified went roughly ten to fifteen feet to his left.

{¶36} Officer Trego testified that he actually saw Hicks point the gun right in their direction and fire. He testified, "[Hicks] basically shouted either get back or get away, raised his hand, I saw a gun in his hand, fired off the shot, saw the muzzle flash, and then heard what I thought was possibly a round striking to our left-hand side in the grass." (Tr. at 213). Officer Trego testified specifically that he saw Hicks point the gun "right [in] our direction and fire[] a round[.]" (*Id*.) Thus Officer Trego explicitly testified that Hicks aimed the gun at him and Detective Burt, and that he observed Hicks fire the weapon. Corroborating the officers' testimony, spent shell casings were recovered in the area where Hicks was positioned with his weapon in the backyard while the residence was burning.[2] Officer Trego's testimony also directly undermines Hicks's claim that none of the officers witnessed a muzzle flash from the weapon.

---

[2] The weapon itself was also recovered, and the casings matched the rounds in the gun.

-16-

**{¶37}** When viewing the evidence presented in the light most favorable to the prosecution, we cannot find that insufficient evidence was presented to convict Hicks on this count of Felonious Assault or the accompanying specification.

**{¶38}** In arguing that his conviction was against the weight of the evidence, Hicks makes a number of claims essentially contending that the police did not conduct enough investigation to see if Hicks had fired his weapon such as swabbing his palms or checking the firearm for a round in the chamber. However, there was no testimony indicating that there was *not* a round in the chamber of the weapon when it was recovered and there was direct evidence provided by Officer Trego that Hicks fired the gun directly at the officers. On the basis of the evidence presented, we cannot find that Hicks's conviction for Felonious Assault and the accompanying specification against Detective Burt/Officer Trego was against the weight of the evidence. Therefore, Hicks's argument on this issue is not well-taken.

**{¶39}** Hicks's second Felonious Assault conviction was related to the bullet he fired at Deputy Mark Lawson. Deputy Lawson testified that as he arrived on the Hicks' property and got out of his vehicle, Hicks "pointed his gun at [him] and fired." (Tr. at 229-230). Deputy Lawson testified that he actually saw Hicks point his gun at him, and that it was "absolutely not" a warning shot. (Tr. at 239). When viewing Deputy Lawson's testimony in the light most favorable to the

prosecution, we cannot find that there was insufficient evidence to convict Hicks of Felonious Assault and the accompanying specification.

{¶40} Hicks attempts to argue that his conviction was against the weight of the evidence by contending again that the State did not prove Hicks had actually fired the gun, arguing rather that the sound of gunfire could have been rounds of ammunition that were in the house fire popping off from the basement. In addition, Hicks argues that Deputy Lawson did not testify to seeing a muzzle flash when the gun was fired. However, Deputy Lawson specifically testified that Hicks fired the gun at him and that it was not possible that the gunshots he heard were from rounds popping in the basement. (Tr. at 236). On the basis of Deputy Lawson's testimony we cannot find that the factfinder clearly lost its way on this issue. Therefore Hicks's arguments as to his Felonious Assault convictions and the accompanying specifications are not well-taken.

## 2. Abduction

{¶41} Hicks was also convicted of Abduction in violation of R.C. 2905.02(A)(2), which reads, "No person, without privilege to do so, shall knowingly * * * [b]y force or threat, restrain the liberty of another person under circumstances that create a risk of physical harm to the victim or place the other person in fear[.]"

{¶42} On appeal, Hicks argues that there was insufficient evidence to support the conviction for Abduction, and that his conviction was against the weight of the evidence. Specifically, Hicks contends that there were no witnesses to corroborate Donna's story, and that the evidence did not indicate that Donna was in fear of Hicks.

{¶43} Despite Hicks's arguments, Donna testified that Hicks prevented her from leaving her house on the date of the incident not once, but twice. The second time Donna testified that Hicks physically pulled Donna several feet toward the garage, restraining her from leaving. Donna also testified that Hicks physically struck her, that he also kicked her, and that she was in fear of him. Donna testified that she had to physically kick Hicks in the groin twice to ultimately get away from him. As a result of the incident, Donna testified that she had bruises and blurry vision.

{¶44} Thus not only did Donna testify that she was in fear of Hicks, she also testified that she was physically harmed by him, which goes even further than what is necessary under the Abduction statute. All that is required under the statute to prove Abduction is that the victim be subjected to *a risk* of physical harm or be in fear. Here, not only was there a risk of physical harm in this instance, but there was actual physical harm.

{¶45} When viewing the evidence in the light most favorable to the prosecution, we cannot find that that there was insufficient evidence presented to convict Hicks of Abduction of Donna.

{¶46} In arguing that his conviction for Abduction was against the weight of the evidence, Hicks challenges Donna's credibility stating that her actions were not consistent with a woman in fear. However, as previously noted, placing the victim in fear is only one possible path to Abduction, and physical harm was present here. Nevertheless, Donna specifically testified that she was in fear of Hicks and the jury was free to judge her credibility and her actions. Therefore, we cannot find that his conviction was against the weight of the evidence. Accordingly, Hicks's argument on this issue is not well-taken.

*3. Aggravated Arson*

{¶47} Hicks was also convicted of Aggravated Arson in violation of R.C. 2909.02(A)(1), which reads, "No person, by means of fire or explosion, shall knowingly * * * [c]reate a substantial risk of serious physical harm to any person other than the offender[.]"

{¶48} On appeal, Hicks argues that there was insufficient evidence to support his conviction for Aggravated Arson and that his conviction was against the weight of the evidence. Hicks's sole argument against his conviction seems to

be that the arson investigator, and also the jury, did not take into account the possibility that Donna could have set the fire.

{¶49} Hicks attempts to establish motive for Donna as a potential suspect for starting the fire, pointing out that Donna had picked up some of the gasoline that day, that Donna later filed for divorce from Hicks and that Donna eventually contacted the insurance company to try and get reimbursed for some of the losses from the fire. However, Donna testified that picking up gasoline for Hicks was routine, that she was not fully reimbursed for all of the losses from the fire, and that she had contemplated divorce even before the September 5, 2013 incidents.

{¶50} Moreover, Hicks's argument ignores his own statements made in an interview with the police where Hicks stated that Donna would not know anything about the fire because she left. (State's Ex. 12). Hicks also made the statement in his interview with the police that he remembered thinking "What'd I do?" as he watched the house burn.

{¶51} In addition, Donna testified to threats that Hicks had made on the day of the incident regarding burning down the house. Donna testified that Hicks threatened to burn the house down and threatened to burn it to the ground before he let anyone else have it. Furthermore, when Hicks finally submitted to authorities, he had various burns on his body indicating proximity to the fire. Thus on the basis of the evidence presented we cannot find that there was

insufficient evidence to convict Hicks, or that his conviction was against the weight of the evidence. His argument on this issue is, therefore, not well taken.

{¶52} Accordingly, having found no error prejudicial to Hicks in the particulars assigned, Hicks's assignment of error is overruled.

{¶53} For the foregoing reasons Hicks's assignment of error is overruled and the judgment of the Seneca County Common Pleas Court is affirmed.

*Judgment Affirmed*

**ROGERS and PRESTON, J.J., concur.**

**/jlr**